HENRY ALLEN, APPELLANT, VS. NELSON HAWLEY, APPELLEE.

1. As a general rule, the several owners of a Merchant Vessel or Steamboat, hold their respective interests therein, as *tenants in common* and not as *co-partners*, and consequently are to be governed by the rules of law, applicable

to that species of tenure. But to this rule there may be *exceptions*, either growing out of the express agreement of the parties, or to be implied from the nature and character of the business or adventure in which they may be engaged.

2. Where partnership funds are invested in the purchase of a Steamboat, in the absence of any positive stipulations between the part-owners to the contrary, they will hold their respective interests in *strict partnership* and the property will be subject to the law of partnership. The case of "Loubat *vs.* Nourse" (5 Florida Rep. 350,) referred to and approved.

3. An injunction will be granted upon *motion and without notice*, whenever the giving of the notice would probably accelerate the injury complained of in the bill of Complaint. The peremptory requisition for the giving of notice provided for in the Statute regulating chancery proceedings, is limited and restricted to applications " *to stay proceedings at law.*"

4. Whenever the intervention of a Court of Equity becomes necessary in consequence of dissentions or disagreements between the Copartners, to effect a settlement or closing of the partnership concerns, upon bill filed by any of the partnres, showing either a *breach* of *duty* on the part of the other partners or a *violation of the agreement* of partnership a Receiver will be appointed as a matter of course.

5. A Court of Equity has no authority to appoint a receiver, with a view permanently to carry on the business of a partnership, but there is no impropriety in directing the Receiver to superintend the business, during the pendency of the legal proceedings instituted for the purpose of dissolving the partnership.

6. If a Receiver either exceed or abuse his authority, as defined by the terms of the order making the appointment, and injury or damage thereby result to any of the parties in interest, they have their remedy on his bond. But such transcending or abusing of his authority, cannot, on appeal, be urged against the validity of the order.

7. In all cases of a partnership at will, whether the contract was originally of that nature, or has become so by effluxion of time, or from other circumstances, a Court of Equity will, upon a dissolution, decree a sale of the entirety of the partnership effects, at the desire of any of the parties,

8. When the answer fully denies all the circumstances upon which the Equity of the bill is founded, it is the usual practice to dissolve the injunction. But there is no *inflexible* rule to this effect, for the granting or continuing of the

injunction, must always rest in the sound discretion of the Court, to be governed by the nature of the case.

9. Each of the Copartners has a *specific lien* on the partnership stock, not only for the amount of his share, but for monies advanced by him beyond that amount for the use of the copartnership, and the share of each, is the proportion of the residue, on the balance of account.

Appeal from Franklin Circuit Court, sitting in Chancery.

Nelson Hawley filed his bill in the Court below, alleging that he and Henry Allen having contracted with the Government of the United States for the transportation of the mail between Apalachicola and Chattahoochee for four years, from the first of July, 1847, entered into articles of agreement for the purchase of a Steamboat to be used as well in said service as in the transportation of freight and passengers, of which agreement, the following is a copy, viz :

STATE OF FLORIDA, }
   County of Franklin. }

This agreement made and entered into between Henry Allen of the State aforesaid, and Nelson Hawley, of the aforesaid State and County of Gadsden, witnesseth, that the said Henry Allen and Nelson Hawley, being jointly interested in a contract with the United States, for carrying the mail for four years, commencing on the first day of July next, upon the Apalachicola River, between the city of Apalachicola and Chattahoochee on said river, known as route No. 3523, all in the aforesaid State ; and in order to carry out the aforesaid contract, do agree that the said Henry Allen, on his part, is to furnish in cash the sum of three thousand dollars, and the said Nelson Hawley, on his part, is to furnish the like sum of three thousand dollars ; and it is further understood and agreed, that the said money, say

six thousand dollars, is to be paid into the hands of the said Henry Allen, and he is to proceed at once to New Orleans, and if necessary, up the Mississippi and Ohio rivers, for the purpose of purchasing a suitable steamboat, to carry out the conditions of the said mail contract, using his judgement and means to the best advantage in making a selection and purchase of said boat; and if found upon examination, to be for the benefit of the parties interested to pay more than six thousand dollars for the said boat, he, the said Allen, shall be authorized to give a joint note for the balance required, or secure the parties by lien upon the boat, as may be most expedient. All necessary expenses occuring in purchasing said boat, to be shared equally by both the above mentioned parties. And it is understood and agreed, that Allen is to have command of said boat or boats, at a reasonable salary, say one hundred dollars per month, and to give his undivided attention to the interest of the contractors. And it is further agreed that Daniel Fry is to be employed in the capacity of engineer to furnish his own second at a salary of one hundred and thirty-five dollars per month, as long as he faithfully discharges the duties in the above capacity, to the satisfaction of the Master of the Boat. In witness whereof &c., &c."

Dated 8th May, 1847.

The Complainant, Hawley, also alleged in his bill that he had advanced and paid to said Henry Allen the sum of Three thousand dollars, provided to be paid by said articles of agreement,—that Allen did purchase a Boat, called the "Quincy," costing fourteen thousand six hundred and fifty dollars, with which he had been engaged in the Mail service as mentioned in the agreement and in the business of

transporting freight and passengers, having the entire control and management thereof and of the funds. That shortly after the arrival of the Boat he applied to said Allen for a bill of sale and to be recognised as joint owner and for an account all of which was refused, and was compelled to incur considerable expense and trouble to institute proceedings at law to obtain a bill of sale and his rights. That during the service of said Boat, she made a large sum of money, out of which, Complainant claimed he was entitled to his portion.

The Complainant further alleged that the four years of the mail contract for which said Boat was bought, having elapsed, he made application to said Allen for a settlement and adjustment of the affairs of said Boat and for its disposal by sale or otherwise, and that he proposed, as a means of attaining that end, either to sell or buy; that pending this proposition he perceived that the Boat was firing up as if ready for departure and that he immediately went on board and protested against her being taken out of the waters of the State, but that said Allen disregarding his wishes and in definance of his rights proceeded with the said Boat to the County of Decatur, in Georgia, where he left her and proceeded himself to the North ; that said Boat remained in said County until he, Complainant, on being informed that a seizure of said Boat was made by process of law in Georgia and that a sale was about to be had, was compelled out of regard to his own interests, to advance his own means and take up the fi. fa. against said Boat, to save her from sacrifice.

The Bill concludes with a prayer for an account, &c., for a dissolution of the joint interest and a sale of the boat, for a Receiver with power to make repairs with reference

to a sale, and for an injunction restraining said Allen from further interfering with said boat or its proceeds, or from collecting any debts, &c., due the same, or from selling or otherwise disposing of his interest therein.

The complainant filed as part of his proofs a copy of the execution issued in Georgia, which had been levied on said boat and taken up by himself.

The Court below, on motion of complainant granted an order, directing a writ of injunction to issue as prayed for in the bill, and also appointing Archibald T. Bennett Receiver, "to take charge of the steamer Quincy, to prevent injuries from waste and decay, and other casualties as far as may be practicable ; to repair the said boat so as to put her in condition for sale, or such disposition of her as may be ordered by the parties, or the Court may order, the expense of repair and the like to be repaid by proper use of the said boat."

Henry Allen subsequently filed his answer, in which he admitted the articles of agreement above recited, and also that complainant Hawley, had paid him the sum of three thousand dollars, as provided therein, which he applied in the purchase of said boat. The defendant alleged that the greater part of the difference between the cost of said boat and the cash contributed by the parties, was paid by his drafts and notes. He admitted that he took a title to said boat in his own name, and that he refused to give to Hawley a bill of sale for one half thereof, but alleged that he felt justified in so doing, from the fact that he had given his notes and drafts for a large sum for the balance due on said boat, and until the same was paid, he was unwilling to give complainant a title to said boat; that all the matters in dispute between complainant and defendant

were, after the filing of a bill by complainant for an adjustment of them, settled by arbitrators to whom they had been referred, and that in pursuance of their award he executed a bill of sale to complainant for one half of said boat. He further says in his answer, that he did take the boat to Decatur County, Georgia, but not in the manner or with the intent alleged in the Bill, but that he took her there and laid her up, the business season being over, because it was a safe place for that purpose, and refers to the destruction which befel such boats as were kept at Apalachicola in the summer of 1851, as an evidence of his having done right in not allowing complainant to guide him in the matter. He alleged that complainant was guilty of a wrong when he went to Decatur County and by violence took possession of said boat, as he was informed and believes he did, with the view to harass him with vexatious suits, &c.; that the pretence that complainant was forced to go to Decatur County to prevent a sale of the boat, was without foundation, for that the writ of fi. fa., levied thereon was issued wrongfully, and that so far from there being danger of a sale under said writ, the agents of defendant would'have protected the boat from sale, and that had any sale been made, it could only have been of his, defendant's interest. He further alleged that as to the charge that he refused to sell his interest or buy that of complainant in the boat, he well knew the improbability that he could in any negotiation with complainant of purchase or sale escape without loss, and therefore declined entering into any such treaty and refused so to do. Defendant further alleged that he refused to give his assent to making any repairs which complainant desired to make on said boat, because he considered the hull of said

boat to be in such a condition as to make it impossible to repair said boat at any rate that would justify his doing so, and he gave notice to complainant that he would not be answerable for any repairs and would not consent to the same, and he insisted that complainant in procuring the order to have repairs made without notice to him, and by procuring the repairs, acted in such a manner as should render him, complainant, alone responsible for the same, &c.; that his, defendant's share of the boat would be swallowed up in paying for repairs, should a sale of said boat be made for the purpose. The answer denied the charge in the Bill, that he had refused to render an account or to permit the complainant to examine the books, &c., and it also in terms, denied all the equities set up in the Bill &c.

Afterwards complainant petitioned for a sale of the boat, on the ground that she was running at great disadvantage for want of new shafts, &c., and because she could be run to much greater advantage by some person who had the ownership and full power and control over her, than by the Receiver, under the authority of the Court.

The prayer of this petition was granted and a sale of the boat was ordered by the Court, the funds to be retained, &c.

Another order was afterwards granted, directing a distribution of the proceeds of the sale of the boat, amounting to $4000, to be made, by which the Receiver was required to retain $713, (claimed by an alleged creditor, but contested by the parties) until further advice, and to pay the sum of $3342,88, to parties named therein.

The defendant, Allen, feeling himself aggrieved, appealed from the orders granted, viz : the order granting an injunction ; the order appointing a Receiver ; the order of

sale of boat Quincy; the order refusing to dissolve injunction and vacate the order appointing Receiver, and the order for the distribution of the fund arising from the sale of said steamboat.

*W. G. M. Davis and T. J. Eppes,* for Appellant.

*G. S. Hawkins,*                              for Appellee.

DUPONT, J., delivered the opinion of the Court.

The first point that arises in this cause and upon the decision of which mainly depend many of the positions of law, assumed by the Counsel of the appellant, involves the inquiry as to the character of the tenure, by which several individuals may hold title to merchant ships or steamboats; in other words the relation which the several individuals hold to each other, in respect to the ownership of that particular species of property.

All writers upon the subject of commercial and maritime law concur, that as a general rule, merchant vessels employed in navigating the ocean (and we have discovered no exception in respect to steamboats plying on the waters of the interior rivers and lakes,) are held in tenancy in common, and not in joint tenancy, and thereby withdrawing that particular species of property from the operation of the law of " *Partnership.*" In confirmation of this being the general rule on the subject, it is laid down in the books that " a ship is a chattel of which the owners are possessed as tenants-in-common; though if it be conveyed to them at one and the same time, and by one instrument, they are more properly joint-tenants, without benefit of survivorship." (Coll. on Part., Sec., 1185, Perkins Ed.)

Judge Story in his treatise on the law of partnership, (§ 417,) concurs in the doctrine thus: "Property in a ship

(says this author,) may be acquired by two or more persons, either by building it at their own expense, or by the purchase of a part thereof of the sole owner, or by the joint purchase of the whole, of another person, but whether acquired by a joint building, or a part purchase, or by a joint purchase, the parties, in the absence of all positive stipulations to the contrary, become entitled thereto as tenants-in-common and not as joint tenants. In this respect it will make no difference whether the title is acquired at one and the same time, by and under one and the same instrument, or whether it is acquired at different times and under different instruments." And to the same effect are all the adjudications, both in England and in this country. Dodington vs. Haller, 1 Vesey, 497—Ex parte, Young, 2 Ves. and Beam., 242 ; Nicoll vs. Munford, 4 John. Ch. Rep., 522. Munford vs. Nicoll, 20 John. R., 611.

This however is to be taken as the enunciation of a general rule, and not as a *universal* principle, and like all general rules subject to exceptions. In this the authorities all agree. Collier in announcing the rule, limits it thus : " But a ship as well as other chattels, may be held in strict partnership, with all the control in each partner incident to commercial partnership." Coll. on Part., § 1186, Perk. Ed.

Judge Story qualifies the doctrine by stating it to be so " in the absence of all positive stipulations to the contrary," (Story on Part., § 417) and thereby tacitly admits that the general rule may be modified by the contract or agreement of the parties. Chancellor Kent also recognizes the exception, and with his usual clearness, has stated the distinction between part ownership and

partnership in this species of property. He says, " the cases recognize the clear and settled distinction between part owners and partners. Partnership is but a tenancy in common, and a person who has only a part interest in a ship is generally a part owner, and not a joint tenant or partner. As part owner he has only a disposing power over his own interest in the ship, and he can convey no greater title, but there may be a partnership as well as cotenancy in a vessel; and in that case one part ' owner, in the character of partner, may sell the whole vessel, and he has such an implied authority over the whole partnership effects as we have already seen. The vendee in a case free from fraud, will have an indefeasable title to the whole ship. When a person is to be considered as a part owner or as a partner in a ship, *depends upon circumstances.*"— (3 Kent's Com., Sec. 45, p. 154, 4th Ed.)

In Harding vs. Foxcroft, 6 Greenl. R., 77, Mellen, Chief Justice said, "there may be a partnership as well as a cotenancy in a vessel. When a person is to be considered as a part owner and when as a partner in a ship, depends on circumstances. The former is the general relation between ship owners, and the latter the exception, and it is required to be shown specially." In Philips vs. Purvington, (15 Maine, 427,) Shepley, J., remarks, "it is contended that they were not partners but tenants in common of the vessel. Such is the usual relations of part owners, but they may become partners." In the case of Lamb et al., vs. Durant, 12 Mass. R., 60, Parker, C. J., says, "vessels owned by a copartnership are certainly effects of the partnership and not unfrequently the principal effects. Occasion for selling them frequently arise in the course of business, and notwithstanding they are common-

ly conveyed by an instrument under seal, they may pass by delivery only, as well as any other chattle, so far as respects the property of the vessel. No exception from the authority of the partner relative to partnership effects, can be found in favor of vessels ; and there seems to be no reasons for such exception."

Upon the authority of the decision, in the case of ex parte Young, 2 Vesey and Beam., 242, which was decided by Lord Eldon, and the effect of which decision according to Mr. Collier, was to over-rule Lord Hardwicke's opinion in the case of Dodington vs. Hallet, 1 Vesey, 497. Chancellor Kent decided the case of Nicoll vs. Munford. In delivering his opinion in that case he says, in allusion to the decision of Lord Hardwicke, "I dare not therefore follow a case which has never had effect, and has been so authoritatively exploded. The cases which have been referred to, are in point against the allowance of any partnership claim, or taking an account on the foot of any partnership in the vessel."

With all proper deference and respect for the opinions of Mr. Collier and Chancellor Kent, the former of whom asserts that the decision of Lord Hardwicke had been "*expressly over-ruled*," and the latter that it had been "*authoritatively exploded*," we are inclined to think that the language used in respect to the effect of that decision, is too strong. The language adopted by Lord Eldon in delivering his opinion in the case of ex parte Young, seems to us expressly to decline to over-rule the case of Dodington vs. Hallet, for he says, " the difficulty in this case arises upon the decision of Dodington vs. Hallet by Lord Hardwicke, which is directly in point. That case is questioned by Mr. Abbot, who doubts what would be done with it at this day,

20

and I adopt that doubt.   The case which is given  by  Mr.
Abbot from the Register's Book is a clear decision by Lord
Hardwicke that  part   owners  of ships  being  tenants in
common, and not joint tenants, have a right notwithstand-
ing to consider that as a chattel   used in   partnership and
liable as partnership effects to pay all   debts whatever  to
which any of them are liable on account of the ship.   His
opinion went the length  that  tenants  in    common had a
right to make a sale.     There is great difficulty upon that
case and the inclination of my judgment  is against  it, *but
it would be a very strong act for me by an order in bankrupt-
cy, from which there is no appeal, to reverse a decree made by
Lord  Hardwicke in a cause.      From a manuscript, I know
that it was his most solemn and   deliberate   opinion after
great consideration, that the contrary could not  be   main-
tained, and there is no decision in equity contradicting that."*
In the  note of  Lord Eldon's judgment in ex   parte  Harri-
son (2 Rose R., 78 note,) the language attributed to him is,
" I certainly differ  from Lord Hardwicke, but I hesitate to
decide against his deliberate judgment in a cause, upon  a
petition in Bankruptcy."

But whatever may be the effect to  be given to  Lord  El-
don's opinion, it is very certain that Chancellor Kent, who
based his decree in  the case of  Nicoll  vs.  Munford, upon
that opinion was  reversed  upon  a  review of that case
in the  Court of Errors of New  York, Munford vs.  Nicoll,
20 John R., 611.

It is not at all improbable that the apparent difference which
seems  to  exist between Lord Hardwicke  and Lord Eldon
on this subject, has grown out of  a misapprehension of the
extent to which the former intended to be understood as hav-
ing gone, in his decision of the case of Dodington vs.  Hallet;

that case might very well from its circumstances have been decided as it was, without in the least trenching upon the doctrine which recognizes the distinction between the rights of Tenants in common and copartners. Spencer, C J., in Munford vs. Nicoll, says Lord Hardwicke, perfectly understood the distinction between a tenancy in common, such as owners of different shares in a ship have among themselves, and a joint tenancy, as between partners of the goods and stocks in trade. He meant to decide, and did decide, that a subject which ordinarily may be held as a tenancy in common, may by the acts of the parties become to be held in joint tenancy, and the fact of the agreement to build the ship at their joint expense, in proportion to their shares, and the agreement to fit her out, manage and victual her for the service of the East India Company, formed in his judgement, such a community of interest, as to constitute that a partnership transaction in relation to those subjects, and thus a *specific lien* was acquired, &c. In the course of his opinion, Chief Justice Spencer further remarks: 'I must not be supposed to overrule the distinction between partners in goods and merchandise, and part-owners of a ship. But I mean to say that part owners of a ship may, under the facts and circumstances of this case, become partners as regards the proceeds of the ship; and if they are to be so regarded, the right of one to retain the proceeds until he is paid what he has advanced beyond his proportion, is unquestionable.

The result of our investigations is that as a *general rule*, the several owners of a merchant vessel or steamboat, hold their respective interests as tenants in common, and not as copartners, and consequently are to be governed by the rules of law applicable to that species of tenure; but

that, to this rule, there may be exceptions, either growing out of the express agreement of the parties, or to be implied from the nature and character of the business or adventure, in which they may be about to engage.

Applying the principle to the present case, and we are very clear in the opinion that the Appellant and Appellee as part owners of the Steamboat Quincy, held their respective shares in the same, not as tenants in common, but as copartners.

There is no evidence in the record of an *express agreement* between the parties that their respective interests in the boat was to be held in strict partnership, but originating as these interests did out of a copartnership business and being subservient thereto by the express terms of the agreement entered into between them in reference to that business, we do not see how it can be looked upon as an interest outside of that partnership. For a correct understanding of our views on this point we give the written agreement alluded to, *in hæc verba*, which may be found in the record, and noted as " exhibit A." :—

STATE OF FLORIDA, }
  County of Franklin. }

This agreement made and entered into between Henry Allen of the State aforesaid, and Nelson Hawley, of the aforesaid State and County of Gadsden, witnesseth, that the said Henry Allen and Nelson Hawley, being jointly interested in a contract with the United States, for carrying the mail for four years, commencing on the first day of July next, upon the Apalachicola River, between the city of Apalachicola and Chattahoochee on said river, known as route No. 3523, all in the aforesaid State ; and in order to carry out the aforesaid contract, do agree that the said Henry

Allen, on his part, is to furnish in cash the sum of three thousand dollars, and the said Nelson Hawley, on his part, is to furnish the like sum of three thousand dollars ; and it is further understood and agreed, that the said money, say six thousand dollars, is to be paid into the hands of the said Henry Allen, and he is to proceed at once to New Orleans, and if necessary, up the Mississippi and Ohio rivers, for the purpose of purchasing a suitable steamboat, to carry out the conditions of the said mail contract, using his judgment and means to the best advantage in making a selection and purchase of said boat; and if found upon examination, to be for the benefit of the parties interested to pay more than six thousand dollars for the said boat, he, the said Allen, shall be authorized to give a joint note for the balance required, or secure the parties by lien upon the boat, as may be most expedient. All necessary expenses occuring in purchasing said boat, to be shared equally by both the above mentioned parties. And it is understood and agreed, that Allen is to have command of said boat or boats, at a reasonable salary, say one hundred dollars per month, and to give his undivided attention to the interest of the contractors. And it is further agreed that Daniel Fry is to be employed in the capacity of engineer to furnish his own second at a salary of one hundred and thirty-five dollars per month, as long as he faithfully discharges the duties in the above capacity, to the satisfaction of the Master of the Boat. In witness whereof &c., &c."

It will be perceived by reference to this paper that the parties had become " jointly interested in a contract with the United States for carrying the mail for four years" upon a certain mail route, and they mutually agree to furnish, each a certain amount of cash, for the purpose of purchas-

ing a suitable steamboat, " to carry out the conditions of the said mail contract." It is also evident from the terms of the recital in the written agreement that they were co-partners in the strictest sense of the term, so far as the contract for carrying the mail was concerned, and we find it impossible, upon any sound principle, to view the Steam-boat to be purchased in any other light than as an *instrument* to carry out that contract, and a part of the stock in trade. The mail contract was the *subject*, the Steamboat the mere incident, and therefore subservient thereto.

But should we be in error on this point, there is one other view of the subject, that to our minds is unanswerable. It will be remembered that the *cash* contributed by the two parties, in equal portions, amounted to the sum of only six thousand dollars, and that the entire cost of the boat was about fifteen thousand dollars.

The excess of cost, as is made to appear by the record, was secured by a lien on the boat, (in virtue of one of the stipulations of the contract) and that the same was eventually paid off and discharged *from the nett earnings of the boat*. Now in none of the authorities cited for the Appellant, is it for a moment doubted that although the vessel itself may be under the operation of the strict technicalities of a tenancy in common, yet that the proceeds of the cargo or adventure, is subject to the law of partnership.— If this be so, then the case before us is one in which *partnership funds* have been invested in the purchase of a certain species of property ; and it is only necessary to refer to the books to see the effect and operation of such a transaction. The discussions which have occured in respect to the different rules which obtain in the respective cases of partnership and tenancy in-common, have grown out of the

conflicting interests involved in the administration of *real* estate, which had been purchased with the funds of the partnership. This subject was very ably discussed by Thompson J., in the luminous opinion which he delivered in the case of Loubat vs. Nourse, 5 Fla. R. 350, which was decided by this Court, at its term held in Marianna in 1853 ; and the conclusion at which the Court arrived, after an elaborate and critical examination of the authorities both in this Country and England was, that " although such an estate be conveyed to the partners, so as to *vest in them a legal estate as tenants in-common*, yet in the absence of an express agreement, or circumstances showing an intent that the estate is to be held for the separate use of the partners, it will be considered in equity as vesting in the partners, in their partnership capacity, subject to an implied trust that they shall hold it until the purposes for which it was purchased have been accomplished, and that it shall be applied, if necessary, to the payment of the partnership debts.'' This is an authoritative exposition of the law as it at present stands in this State ; and if it be the law governing *real estate*, we can perceive no sound reason why it should not, with greater force, be applicable to every other species of property. The Counsel for the Appellant, in the supplemental brief furnished to the Court, relied further upon the fact, that the Complainant, Hawley, in his bill alleges that he had previously been compelled to resort to a Court of Equity to compell Allen to make him a title to his share in the boat, and deduces therefrom the conclusion that the interests of the respective parties had thereby been severed. It is a sufficient reply to this argument to refer to the opinion in the case of Loubat vs. Nourse, just cited, in which it is laid down that " although such estate be con-

veyed to the partners, so as to vest in them a legal estate as tenants in-common, yet in the absence of an express agreement, or circumstances showing an intent that the estate is to be held for the seperate use of the partners, it will be considered in equity as vesting in the partners," &c.

The case of Fry vs. Hawley, 4 Fla. R., 258, has also been referred to as an authoritative adjudication of the point now under discussion. We have looked very carefully into that case, and think that the counsel has misapprehended the extent of that decision. The point now under consideration did not arise, even incidentally, and it was therefore unnecessary that it should have been decided; nor do we find in the opinion, even a *dictum*, which would support the assumption of the counsel. In that case the Court only decided that the transaction between Hawley and Fry, did not raise a partnership between the three Allen, Hawley and Fry, (there being no privity between, Hawley and Fry,) and left the question as to the *relation* existing between Allen and Hawley, growing out of the terms of the contract for carrying the mail, and the circumstances connected with the building of the boat, wholly untouched.

Having thus determined that the steamboat Quincy, is to be considered as partnership property, and as such property, within the jurisdiction of the Court of Chancery, it now only remains for us to determine upon the propriety of the several interlocutory orders which have been entered in the progress of the suit now pending between the parties; and which (under the provision of the statute) have been appealed from by the defendant below.

The first order mentioned in the petition of appeal, is the "order granting an injunction."

The bill of complaint filed in this cause purports to be by one partner, against his copartner, and contains the usual prayer for account of the profits of the boat, and that she be sold, which is accompanied by the further prayer for the appointment of a Receiver and for the issuing of a writ of injunction, " to restrain the said Allen from further possession or interference with said boat, or its proceeds, or from collecting any debts, dues or demands due the same, or from selling or disposing of his said part of said boat." The bill appears to have been filed on the 10th day of September, 1851, and the writ of injunction, in accordance with the prayer, granted on the same day, but not executed until the 11th day of February, 1852.

In Adams Eq., 641, (margin 37,) the law regulating the granting of an interlocutory injunction is thus stated :— " The grants of the interlocutory injunction is discretionary with the Court, and depends on the circumstances of each case and on the degree in which the defendant or plaintiff would respectively be prejudiced by the grant or refusal." And again at page 639, (margin 335,) an injunction is granted to restrain a defendant, so long as the litigation continues, from doing acts productive of permanent injury, or from proceeding in an action at law, where an equity is alleged against his legal right. On the same page the author further remarks : " The ordinary mode of obtaining this injunction, is by moving after notice to the defendant; but in particular cases where giving notice might accelerate the mischief, it will be granted ex parte, and without notice. *e. g.* in cases of waste, or of negotiating a bill of exchange ; and even where that special ground does

21

not exist, yet if the act to be prohibited is such that delay is productive of serious damage, as in piracies of copyright and patent, an ex parte injunction may be obtained." Our statute provides that no writ of injunction or *ne exeat* shall be granted until a bill be filed praying for such writ, except in the special cases, and for the special causes in which such writs are authorized by the practice of the Courts of the United States exercising equity jurisdiction ; and no writ of injunction to stay proceedings at law, shall issue, except on motion to the Court or Judge, and reasonable notice of such motion, previously served on the opposite party or his attorney, &c.

The injunction in this case was granted on motion, and it does not appear that any notice of the application was given to the opposite party ; and we think that the circumstances sworn to in the bill, made it just one of those cases contemplated by the law, in which the notice might be dispensed with, viz : where the very giving of the notice might in all probability "*accelerate the injury.*"

It will be further noted, that the peremptory requisition contained in the statute above cited, is limited to applications "*to stay proceedings at law*," and in all other cases we presume, that the practice of the High Court of Chancery of England will prevail, where it does not conflict with the rules of Court.

Upon an examination of the record, (for we had no argument from the counsel on this matter of the appeal,) we do not find any error in the order granting the injunction, and do therefore affirm the same.

The second ground of appeal is from "the order appointing the Receiver."

The law in regard to the appointment of a Receiver, in

suits between copartners, is laid down thus by Adams in his work on Equity : "The first step is, that the partnership debts should be ascertained, and the assets applied in their discharge. If the parties cannot agree on the intermediate management, whilst the process of dissolution is going on, a Receiver may be appointed to conduct it.—But the Court cannot permanently carry on the business, and will not therefore appoint a Receiver, except with a view to getting in the effects, and finally winding up the concern." Adams Eq., 437. [margin 243.]

Collier says: "where a dissolution is intended, or has already taken place, a Court of Equity will appoint a Receiver, provided there be some breach of the duty of a partner, or of the *contract* of partnership." (Collier on Part., Perkins Ed., 354.)

In New York, it is a matter of course to appoint a Receiver, if the parties cannot agree among themselves, as to the disposition and control of the property, upon a bill filed by one of the partners, to close up the partnership concern. Martin vs. Van Sharick, 4 Paige 479, Innes vs. Lansing, 7 Paige, 583.

So a Receiver will be appointed as a matter of course, where either partner has a right to dissolve the partnership, and the articles of partnership do not provide for the settlement of the concern, upon a bill filed for that purpose. Law vs. Ford, 2 Paige, 210. In Skip vs. Harwood, a Receiver was appointed of the brewery. It was ordered that it should be referred to the Master, to appoint a proper person to be a Receiver of the stock, goods, &c., of the brewery trade, and the debts due the partnership.—And in the meantime that the defendants to be restrained from alienating, disposing of, or removing any of the uten-

sils or dead stock belonging to the trade.   (Coll. on Part., 354, Note 4.)

A Receiver was appointed of a steamboat, where the owners disputed and required the Court to settle their rights, and such Receiver was required to run the boat.   This was done for two years in the case of the steamboat 'Ontario,' but in that case the Court observed that it was highly inconvenient, and unfit that such operations should be conducted under the direction of the Court for so long a time ; and an order for sale was accordingly made.   (Crane vs. Ford, 1 Hopkins R., 114.)   In this latter sentiment of the Court, we fully concur.   As it is not the province of the Court to create a copartnership, so it is equally foreign from its functions to conduct its business.   It never could have been contemplated, that a Court of Chancery, should become the superintendent of the private affairs of individuals,—its legitimate province is to adjust the rights, and settle the disagreements of parties, growing out of such transactions.

From the examination which we have made of the authorities on this subject, we think the law may be considered as settled, that whenever the intervention of a Court of Equity becomes necessary, in consequence of dissensions or disagreements between the partners, to effect a settlement and closing of the partnrship concerns, upon bill filed by any of the partners, showing either a *breach of duty* on the part of the other partners, or a *violation of the agreement* of partnership, a Receiver will be appointed as a matter of course.

The first three points made by the Counsel for the Appellant in his argument upon this branch of the case come clearly within and fully sustain the rule as thus laid down

and it is therefore unnecessary to notice them further than to remark that they receive our entire approbation.

But it was further contended by the Counsel that the property having been taken possession of by the Complainant, and being at the date of the application for the appointment of the receiver, in his actual possession, it was absurd and contrary to all precedent, that he should ask to have himself deprived of that possession. It is only necessary to advert to the facts of the case, as they appear in the record, to show that the application for the appointment of the receiver, is not obnoxious to the charge of inconsistency or impropriety. By the terms of the written agreement herein before set forth, the *right* of the possession of the boat was guaranteed to Allen. By virtue of that right, he had taken the Boat to Bainbridge, in the State of Georgia, as a safe place to lay her up during the Summer. While there, and in the absence of Allen, who had gone on a visit to the North, as he says, for the benefit of his health, the boat was levied upon by virtue of a writ of *fieri facias*, issued out of the Inferior Court of Early county, in the State of Georgia, and advertised for sale. For the purpose therefore of protecting the joint-interest of the concern, Hawley, as one of the parties in interest, proceeded to Bainbridge, paid off the execution, and, doubtless fearing a repetition of the same thing, took possession of the boat and removed her out of the jurisdictional limits of the State of Georgia. In this whole transaction we see no evidence of any design or intention on the part of Hawley to assert any adversary *right* of possession to that acquired by, and belonging to Allen, under the terms of the written agreement before referred to. We think it therefore unfair to assume that Hawley had the absolute possession of

the boat at the time of the application for the appointment of the receiver. *His possession* was merely casual and entirely subordinate to the *right* of Allen.

The next position assumed by the Counsel was, that a Court of Chancery has no power to appoint a receiver *to carry on the business of a copartnership.*

In this we fully concur, as a general proposition of law, and to ascertain its applicability, it becomes necessary to examine the terms of the order granted in this cause.

The order is in the following words, to wit: " It is further ordered that Archibald T. Bennett be and he is hereby appointed Receiver, to take charge of the Steamer Quincy, to prevent injuries from waste and decay and other casualties as far as may be practicable—to repair said boat so as to put her in condition for sale or such disposition of her as may be ordered by the parties, or as the Court may order. The expense of repair and the like to be re-paid by proper use of said boat." There is certainly nothing in the terms of the order from which it can be gathered that it ever was the design or intention of the Court to invest the Receiver with authority " *to conduct the business of the partnership.*" The assumption, we presume is based upon the last clause of the order, which directs that, " the expense of repair and the like, be re-paid by proper use of said boat," but we do not think even this clause, upon any fair principle of interpretation, will bear such a construction. It was evidently the design of the order, to relieve the copartners from the charge, by causing the boat to reimburse the outlay for repairs ; and thus limited, it was altogether consistent with the strictest propriety. If the receiver has either exceeded or abused his authority as defined by the terms of the order making the appointment, and injury or damage has

thereby accrued to any of the parties in interest, they have their remedy on his bond ; but most certainly, such transcending of his authority (if it has occured) is not to be urged against the validity of the order.

The sixth, seventh, eighth and ninth positions assumed by the Counsel in his argument on this branch of the subject, are already disposed of by the view which we have taken of the character of the title to this property, viz: that it is not a tenancy-in-common, but a strict partnership.

Applying then to the case, the rule which we have herein laid down in regard to the appointment of a receiver, and without going into an enumeration of the various charges set forth in the bill of the complaint, we are constrained to say that the case presented, strongly demanded of the Chancellor, the interposition of his power, to make the appointment.

The third ground of appeal mentioned in the Appellant's petition is, from, " The Order of Sale of the Boat Quincy."

The entire argument of the Appellant's Counsel upon this branch of the case, proceeded upon the assumption that the parties held their respective interests in the boat as tenants-in-common and not as copartners.   As before observed, any argument made upon this hypothesis and the authorities cited in support thereof, become wholly inapplicable, from the decision which we have heretofore arrived at in considering the main question.   There was no exceptions taken in the argument to the *terms* of the order. The only objection alleged in support of the appeal, was as to the *authority* of the Court to grant the order.

In Adams' Equity 461 (margin 245) the law on this subject is thus laid down: " In order to effectuate the realization of assets, the payment of debts and the distribu-

tion of surplus, the Court has an authority over partnership estate, which does not exist in other cases of common ownership,—that of directing its sale and conversion into money. And this jurisdiction may be exercised, either by the same decree which directs a dissolution, or if dissolution has already taken place, by an interlocutory order."

There are many cases in which a Court of Equity will assist the settlement of partnership accounts, by decreeing in the first place a sale of the property. Where no provision is made for the disposition of the partnership property upon a dissolution, this exertion of equitable jurisdiction seems to arise necessarily, from that general principle, that the retirement of one partner is the dissolution of the whole society. (Coll. on Part. § 307.)

" It appears therefore, that in all cases of a partnership at will, whether the contract was originally of that nature or has become so by effluxion of time, or other circumstances, a Court of equity will, upon a dissolution, decree a sale of the partnership effects, at the desire of the parties." ib., § 313. Upon a proposition so plain however, we deem it unnecessary to multiply authorities, and conclude on this branch of the case, by sustaining the propriety and validity of the order granted by the Chancellor.

The fourth ground of appeal is from " the order refusing to dissolve the injunction and vacate the order appointing the Receiver."

The injunction in this cause, was granted before answer, and the general rule of practice in such cases, is to dissolve the injunction where the answer fully denies all the circumstances upon which the equity of the bill is founded. Hoffman vs. Livingston, 1 John. Ch. R., 211; Livingston vs. Livingston, 4 Paige Ch. R., 111; Wake-

man vs. Gillepsy, 5 Paige Ch. R., 112; Cowles vs. Carter, 4 ibid, Eq. R., 150; Gibson vs. Tilton, 1 Blend Ch. R., 355; William vs. Berry, 3 Sterr & Port. R., 284.

But there is no inflexible rule to this effect, for the granting or continuing of the injunctions, must always rest in the sound discretion of the Court, to be governed by the nature of the case.  This doctrine has been fully recognized and authoritatively established by this Court, at its present term, in the opinion delivered in the case of Carter vs. Bennett, and is amply supported by the authorities therein cited.  See also the following precedents :

Roberts vs. Anderson, 2 John Ch. R., 204 ; Poor vs. Carleton, Summer R., 70 ; Bank of Munroe vs. Schermerhorn, 1 Clarke R., 303.

In the case before us, although the equity of the bill is denied by the anwer *in terms,* yet it shows a state of circumstances which raises strong equities ; and we think it would have been improper to have granted the motion for a dissolution of the injunction.  And we are equally clear in the opinion, that the motion to vacate the appointment of the Receiver, ought not to have been granted.

The fifth and last ground of appeal, is from " the order for the distribution of the funds arising from the sale of the Steamboat Quincy."

Upon this head the record affords but very meagre information.  There is nothing but the bare order, setting forth the names of the several distributees, with the amount due to each, and as there was no objection made in the argument to the *correctness* of these claims,' we are to consider them as admitted to that extent.  We understand, however, the position of the counsel for the appellant to be this, that the debts having accrued through the action of

22

the complainant, in having repairs made upon the boat, he and he alone, is responsible for such demands, and that they should not be charged upon the proceeds of the sale. To sustain this position, the counsel cited numerous authorities to the effect, that one *part-owner* is not liable for repairs put upon a ship against his will, but that the part owner ordering the repairs will be alone liable for the same. The doctrine invoked by the counsel applies exclusively to cases where the owners hold as tentants in common, and not as copartners, and having already decided that the boat was partnership property, is not applicable in this case. The converse of that proposition, when applied to partnerships, is abundantly established by the authorities. It may be laid down as a general principle that each of the partners has a *specific lien* on the partnership stock, not only for the amount of his share, but for monies advanced by him beyond that amount for the use of the copartnership; and that the share of each, is the proportion of the residue, on the balance of account. Coll. on Part., (Perkins Ed. § 125—127 ; Story on Part., § 360—441.

This disposes of the several grounds of appeal set forth in the appellant's petition of appeal, and it now remains for us only to remark briefly upon the general aspect of the case as presented by the record. It is quite apparent that the issue of this controversy has resulted most disastrously to the interests of both of the parties, causing as it has the total absorption or waste of the entire property. This result might and ought to have been avoided, if that spirit of amity and good faith, which should always characterize the intimate and confidential relation of copartners, had been properly observed. The hardship com-

plained of by the appellant is the legitimate fruit of his own conduct. Had he acceded to the very reasonable proposal of the complainant, to sell or purcharse each others interests, the whole business might have been speedily and amicably adjusted, and a resort to the interposition of the Court been avoided. But this, *according to his own showing,* he obstinately refused, and manifested a fixed determination to oppose the interests of his copartner, even at the sacrifice of his own. The event has resulted in the full consummation of that purpose, and if blame is to attach to any one, he must take it to himself.

The opinion of the Court is, that the appeal be overruled, with costs ; that the several interlocutory orders appealed from, do stand affirmed, and that the cause be remanded to the Court below, for such further proceedings not inconsistent with this opinion, as may be appropriate.