THORN AL, Justice
(dissenting).
On May 5, 1952 appellant Applebaum and appellee Appel, designating themselves collectively as “buyer” entered into a written agreement with Harry G. Daumit, designated as “seller” whereby it was covenanted :
1. Seller agreed to sell and buyer agreed to buy all of the capital stock of Harry Daumit Drugs, Inc., a Florida corporation.
2. For the entire 100 shares of the capital stock of the corporation buyer agreed to pay seller in cash the cost of inventory, less trade accounts payable, plus 2% of the monthly gross receipts of the drug business operated by the corporation until July 31, 1975; payments to be made monthly.
3. Buyer agreed to keep accurate records and file with seller' monthly a statement of the business.
4. Buyer agreed to accept the obligations of an outstanding lease on the premises where the drug business was operated. However, personal liability of the buyer on the lease would not run to the lessor but only to the seller.
5. Acquisition of stock being sold “carries with it that certain business presently being conducted as Harry Daumit Drugs, Inc.,” and buyer agrees to continue operation of said business.
*742 6. Seller retained title to capital stock sold until purchase price was paid in full but buyer was granted full voting rights with privilege of transfer, subject to the agreement.
7. Buyer assumed certain liabilities of the corporation as shown by an agreed audit.
8. Buyer agreed to pay taxes and insurance.
9. Buyer agreed to maintain inventory of certain value.
10. Buyer agreed to file all necessary corporation tax reports and the like.
11. Seller agreed to endorse stock certificates to the buyer showing endorsement subject to the agreement.
The provisions of this written agreement have been summarized in order to reveal the mutual obligations to the seller assumed by both parties describing themselves as “buyer”, when the business was acquired through the medium of an agreed transfer of the entire capital stock of the corporation, to both parties to the cause.
The entire capital stock was evidenced by two certificates, each for fifty shares. These certificates were endorsed to “J. M. Appel and Bernard B. Applebaum” but the endorsements were never signed. The lack of signatures to the endorsements was accounted for as an oversight of some kind, rather than as any failure by the seller to comply with the transfer agreement of May 5, 1952.
By his bill appellant complains that after execution of the agreement of May 5, 1952, the appellee, his uncle, entered upon a course of behavior calculated to harass, annoy and intimidate him and that appellee ultimately completely ousted him from the business. It is further contended that appellee held purported stockholders meetings without notice and had arbitrarily taken control of the business, signed checks, hired unnecessary personnel, paid exorbitant wages, sold merchandise without regard to cost, and was generally ruining the business to the great harm of appellant who seeks a receiver, an injunction and an accounting. Further, he admits that appel-lee put $28,000 into the business being about $10,000 paid to seller when the written contract was signed and about $18,000 in advances to the corporation, but alleges that he, the appellant, has invested $500 cash plus a great deal of skill, time and experience as a pharmacist that was producing a profitable and growing business until appellant was summarily ousted by appellee. The $28,000 appear on the books of the corporation as a “loan” made by appellee to the corporation.
Appellee alleges that appellant never was supposed to have an equal interest in the business; that according to a verbal agreement predating May 5, 1952, appellant was to sell his other drug store, invest the proceeds in the new venture and spend his full time on the job. He ignores the obligations assumed by appellant under the written instrument. For these considerations appellant was to receive 30% of the stock, while appellee was to receive 40%, and a third party — a sister of the appellee was to receive 30%. This sister appears only in the testimony. She was not mentioned in the May 5, 1952 agreement. Further, appellee alleges that appellant had no right to vote any stock, and says that he was to be merely an employee of the drug store but that his services were no good so he, appellee, discharged him. He also álleges total failure of appellant to comply with the verbal agreement heretofore described although he did put $500 into the business and did.work in the business several months for which he was paid a salary.
The Chancellor heard the testimony, denied the receivership and decreed that appellant is not entitled to any interest in the capital stock of the corporation but that the corporation should return to appellant the $500 and that sums paid to appellant by the corporation as salary, be shown on the books as salary, and not as a loan to appellant who was also directed to pay all of the court costs.
*743 Appellant complains on appeal that he should have been declared to be a co-tenant with appellee in ownership of the stock in the corporation and therefore the business.
I agree with appellant.
The evidence was in dire conflict as to the alleged earlier verbal understanding but there is no conflict on the subsequent written agreement of May 5, 1952, which was executed by both of the parties and which clearly established their mutual obligations and responsibilities as well as their legal interest in the capital stock of the corporation. Even appellee admits that appellant was to receive 30% of the stock under the verbal agreement. The effect of the decree of the able Chancellor is to leave appellant without any stock or interest in the corporation, but at the same time leave him thoroughly and completely bound by obligations of the written agreement.
It appears beyond question that by the written agreement appellant became a co-tenant with appellee in the ownership of the capital stock of the corporation. True, appellee has put more money into the venture than appellant but that does not conclusively alter the basic legal relationship of the parties. From any view of the evidence they were tenants in common. The over-all effect of this relationship now is that while appellee may be entitled to contribution from appellant for sums advanced for the protection of appellant’s stock interest, whatever percentage it may ultimately be determined to be, and this will have to be ascertained upon further hearing, he is not entitled to have appellant’s stock interest totally forfeited.
That there can be a tenancy in common in personal property is well established. 14 Am.Jur., Cotenancy, Sec. 19; Allen v. Hawley, 6 Fla. 142, 63 Am.Dec. 198; Kellum v. Williams, 252 Ala. 71, 39 So.2d 573.
The relief available to appellee, if any, is suggested by Walker v. Sarven, 41 Fla. 210, 25 So. 885, 887, wherein it was said:
“* * * If either party had paid more than his just share of the joint debt, he could have maintained a suit for contribution against his co-tenant, and enforced his right to contribution as against his co-tenant’s interest in the land. * * *”
See also Meckler v. Weiss, Fla., 80 So.2d 608.
The final decree should be reversed for further proceedings not inconsistent with this opinion.
DREW, C. J., and TERRELL, J., concur.